UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No.  2:12-cr-131 |
| | : | |
| MICHAEL L. VASQUEZ, | : | |
| | : | |
| Defendant. | : | |

MEMORANDUM OPINION AND ORDER

Defendant Michael L. Vasquez is charged with conspiracy to distribute heroin, marijuana, and 28 grams or more of cocaine; three counts of distribution of heroin; and possession of a firearm subsequent to a felony conviction.  Vasquez filed a motion to suppress audio and physical evidence obtained pursuant to warrants issued on September 6, 2012[1] and September 13, 2012. Vasquez also seeks to exclude an identification by a confidential informant obtained during the investigation.  For the reasons set forth below, this Court **denies** both requests.

BACKGROUND

I. The Investigation

In his September 13, 2012 supporting affidavit for the issuance of four search warrants, Lieutenant (then Detective

---

[1] Vasquez claims to be challenging the September 6, 2012 warrants for recording phone and personal contact, but the substance of both the written arguments and those made at the hearing addressed only the issues discussed below.  The affidavits supporting the September 6, 2012 warrants were not presented or addressed.  Further, law enforcement never executed the September 6, 2012 warrants, and, in any event, a warrant was not required under federal law, because one party to the conversation consented to law enforcement monitoring.  *See e.g.*, *United States v. Bonanno*, 487 F.2d 654, 657-58 (2d Cir. 1973).

Sergeant) Matthew Sullivan of the Burlington Police Department (BPD) provided the following facts.  Mot. to Suppress Exh. A, ECF No. 218-1.  During the week of August 13, 2012, in the course of another investigation, Lieutenant Sullivan and Detective Corporal LaBarge observed a black male driving a silver Audi S8 with Vermont registration FAE280 engage in what appeared to be hand to hand transactions in the parking lot of Champlain Farms in Burlington, Vermont.  Lieutenant Sullivan then collected information from multiple known sources regarding transportation and distribution of heroin, cocaine, and marijuana into Burlington from New York City by Michael Vasquez (a/k/a Macho) and his associates.  The group included Christopher Morales, a/k/a "J" or "Jerry," later learned to be Vasquez's younger brother.

A Cooperating Individual (CI) met with Lieutenant Sullivan and identified the silver Audi S8 referred to above as being used by a black or Hispanic male known as "Macho" and his associates.  The CI knew the group of subjects as distributors of heroin, cocaine or crack cocaine, and marijuana.  The CI informed Lieutenant Sullivan that Macho ran a business-like narcotic distribution organization in Burlington.  Sometime after advising the Lieutenant that the CI could purchase crack cocaine or heroin from Macho, the CI entered into a cooperating

individual agreement with the BPD in exchange for monetary compensation.

The CI had previously worked with the BPD providing reliable information and participating in controlled phone calls and drug purchases.  The CI has a criminal record that includes: retail theft, false pretenses, possession of stolen property, narcotic possession, forgery, probation violations, and passing a bad check.  Over the course of this investigation, the BPD executed a total of four controlled purchases of heroin from Vasquez and his associates with the assistance of the CI.

The first controlled purchase occurred during the week of August 13, 2012.  The CI contacted Macho via text message and then by phone to arrange the buy.  After a series of phone calls with Macho and his associates, an individual the CI knew as "Tara" called to set up the transaction.  The BPD put pre-buy surveillance into place, and kept the CI under surveillance during the entire transaction, which was recorded on video.  The CI purchased more than 200 mg of heroin from "Tara," who was accompanied by a known male.  The CI immediately returned to the predetermined meet location and surrendered the drugs, which later tested presumptive positive for heroin.  Then the CI recorded an audio statement detailing the transaction.  The CI was searched before and after the controlled buy.  No illegal drugs, paraphernalia, or large sums of money were located.

3

On August 21, 2012, Lieutenant Sullivan obtained warrants
to record phone or personal contact with Macho and Taralin
Hopper a/k/a Taralin Helm ("Tara").  A Vermont Superior Court
Judge reviewed and granted the warrants.  Controlled purchases
two through four were recorded via audio transmitter and digital
recorder pursuant to the warrants.

Prior to the second controlled buy, a traffic stop by the
Shelburne Police Department provided the identities of two other
individuals associated with Vasquez.  Lieutenant Sullivan
obtained photographs of Vasquez and the three associates known
to BPD.  During a pre-buy interview in the week of August 21,
2012, as characterized by Lieutenant Sullivan, he accidentally
placed the photo of Vasquez in view of the CI while rearranging
paperwork.  The CI saw the photo and exclaimed words to the
effect of, "that's him."

Lieutenant Sullivan then showed the CI each photo in his
possession, starting with the photo of Vasquez.  The CI
identified the photo as "Macho," commenting that he had lost
weight since the photo was taken.  The CI went on to identify
Taralin Hopper a/k/a Taralin Helm, Keith J. Bruce, and Ashley
Hammond.  The CI described Ashley as Macho's girlfriend and said
that she rented the apartment on St. Paul Street where Macho and
his group stayed.  Lieutenant Sullivan explained in the
affidavit that he did not believe a photo array was necessary

4

given the CI's familiarity with the subjects and the time
constraints of the pending second buy.

For the second controlled purchase during the week of
August 20, 2012, the CI set up the buy with Vasquez by phone.
The CI called Vasquez, who did not answer, but called back to
arrange the transaction.  The CI conducted the transaction with
Vasquez in a vehicle, under surveillance the entire time.
Detective LaBarge video-recorded part of the transaction.  The
CI was again searched before and after the buy, and no drugs,
paraphernalia, or large sums of money were located.  The CI
returned greater than 200 mg of a substance that field-tested
presumptively positive for heroin.  Detectives followed and
photographed Vasquez from the location of the controlled buy to
392 St. Paul Street where he met an individual believed to be
Ashley Hammond.

During the week of August 27, 2012, the CI contacted
Vasquez to arrange another buy, but Vasquez was out of the area.
Another individual used Vasquez's phone and gave the CI another
number that the CI associated with Vasquez's younger brother,
known as "J" or "Jerry".  The CI subsequently set up and
conducted a buy with "J," returning with less than 200 mg of
heroin and less than 2.5 grams of crack cocaine.  The drugs
field tested presumptive positive for heroin and cocaine.  The
CI was kept under surveillance and the transaction recorded in

accordance with the warrants issued on August 21.  Detective
Chenette video-recorded parts of the transaction.  The BPD found
no illegal drugs, paraphernalia, or large sums of money on the
CI during searches before and after the controlled buy.

The CI contacted Vasquez again by phone during the week of
August 27, 2012.  After receiving no response, the CI sent "J" a
text message.  The CI met with "J" and Vasquez and purchased
greater than 200 mg of heroin.  The substance field tested
presumptive positive for heroin.  The CI was kept under
surveillance and the transaction recorded in accordance with the
warrants issued on August 21.  Detective LaBarge video-recorded
parts of the transaction.  The BPD found no illegal drugs,
paraphernalia, or large sums of money on the CI during searches
before and after the controlled buy.

On September 6, 2012, Lieutenant Sullivan obtained further
warrants to record phone and personal contact with Michael
Vasquez a/k/a "Macho," Taralin Hopper a/k/a Taralin Helm, and
"J."  A Vermont Superior Court Judge reviewed and granted the
warrants.  The BPD never executed these warrants.

## II. Vasquez's Arrest for Burglary and Domestic Assault

On September 12, 2012, Lieutenant Davidson contacted
Lieutenant Sullivan about an alleged assault on Ashley Hammond
and her roommate at their apartment at 392 St. Paul Street by
Vasquez, his brother Christopher Morales, and a third

6

unidentified subject.  Hammond also claimed Morales had taken
her purse during or after the assault.  The subsequent
investigation located Vasquez and Morales at an apartment at 194
North Union Street, with the silver Audi S8 found in the rear
parking lot.  Morales was arrested at the apartment.  Police
believed that Vasquez and possibly the third subject had locked
themselves in a bedroom in the apartment.

Officers obtained a search warrant for the North Union
Street apartment to locate Vasquez and Hammond's purse.  Before
the search warrant was executed, Vasquez and Anthony Garcia
exited the bedroom and were arrested.  A search incident to
arrest found $2,162.53 on Vasquez.  Upon executing the search
warrant, Lieutenant Sullivan found $8,039.00 in the dresser of
the bedroom that Vasquez and Garcia had locked themselves in.
During processing, Morales was overheard claiming ownership of
the money in the dresser.  Police seized the Audi S8 to be
searched.  Two dogs were used to drug sniff the Audi, and
alerted to the presence of drugs.  The DEA accepted the money as
an administrative forfeiture.

Officers arrested Vasquez, transported him to BPD
headquarters, and read him his Miranda Rights.  Vasquez waived
his Miranda Rights orally and in writing.  Detective Nash and
Lieutenant Sullivan interviewed Vasquez, and he made several
admissions.  Vasquez spoke about wanting to leave Vermont, and

indicated that he would not be surprised when Lieutenant
Sullivan told him that he had controlled buys into his
organization.  Vasquez explicitly stated, "I have sold plenty of
drugs in my life ...  I have sold plenty of drugs in
Burlington."  Vasquez apologized for any harm he caused to the
community.  Not once did Vasquez deny his involvement in the
drug distribution conspiracy.  He claimed to have forced his way
into the St. Paul Street apartment to speak to Ashley Hammond,
and while there observed an amount of heroin with an estimated
street value of $24,000 to $63,000.  Vasquez also identified
Christopher Morales as his younger brother and referred to
Morales as "Jerry."

On September 13, 2012, Chittenden County Sheriff Brian
Welch informed Lieutenant Sullivan that he overheard Vasquez
telling a female prisoner, believed to be another co-
conspirator, that if she was released she needed to tell "John"
to move the stash.  The same day, Lieutenant Sullivan also
received information from the Shelburne Police that a source
informed them that Taralin Hooper a/k/a Taralin Helm and Amanda
Bevins, another known co-conspirator, were attempting to gain
access to a storage unit on Shelburne Road.  The source
identified herself as Amanda Bevins' mother, Alison Duffy.  She
described the storage unit as possibly being near Champ Car
Wash.  Burlington Self Storage at 1825 Shelburne Road is the

only storage facility in that area.  Alison Duffy also told law
enforcement that Vasquez bought a red Acura CL registered to
Tamarra Peachy-Kountz with VT tags ETM602 for her daughter to
use for narcotics distribution.  Lieutenant Sullivan had
observed that car parked across the street from 392 St. Paul
Street.  Taralin Hooper and an anonymous tipster both informed
police of the Acura's use as a "stash car."

Also on September 13, 2012, Detective Nash spoke with
Ashley Hammond.  Hammond informed Detective Nash that Vasquez
rented a storage unit, where her stolen purse and a laptop she
claimed he had also stolen may be located.  She reported
receiving a call from Vasquez's wife, who planned on coming to
Burlington to "clean out" the storage unit.  Hammond described
the possible location of the storage unit, which matched the
location of Burlington Self Storage.  Detective Nash visited
Burlington Self Storage and spoke with the manager confirming
that Vasquez rented a unit there, number 428.

**III. The Search Warrants**

On September 13, 2012, Lieutenant Sullivan applied for and
obtained four search warrants.  Lieutenant Sullivan wrote
affidavits—all four of which were substantially similar—
containing the above information in support of the warrants.  A
Vermont Superior Court Judge issued warrants authorizing the
search of: (1) a silver Audi S8 bearing Vermont registration

9

FAE280; (2) a red Acura CL bearing Vermont registration ETM602;
(3) the second floor apartment of 392 St. Paul Street,
Burlington, VT; and (4) storage unit number 428 at Burlington
Self Storage, 1825 Shelburne Road, South Burlington, VT.[2]
Response, Exh. 1-4, ECF No.'s 232-1, 2, 3, 4.

**IV. The Supplemental Report**

On September 26, 2012, Lieutenant Sullivan filed a
Supplemental Investigative Report with the BPD Drug Unit
providing details not contained in the affidavits.  Mot. to
Suppress, Exh. B, ECF No. 218-2.  Vasquez bases a number of his
claims of omissions on the contents of the report.
Specifically, the description of the third buy in the report
describes the transaction as taking place around the corner of a
building, out of sight of surveillance.  Similarly, the fourth
purchase took place out of sight of video surveillance and the
surveillance van, but with audio recording.

Vasquez also points to certain inconsistencies detailed in
the Supplemental Investigative Report regarding the fourth buy.
The CI reported giving Vasquez $230, an amount consistent with
reported pricing for ten bags of heroin, but the wire recording
indicated that during the transaction, when Vasquez asked

---

[2] Vasquez also challenges warrants for 12 Boysenberry Dr., Milton, VT and 1664
North Ave., Burlington, VT.  Mot. to Supress n. 3.  Warrants for those
locations do not appear to have been issued.  The government clarifies that
the addresses were listed on the search warrant returns for the vehicles as
the addresses of the owners.  Response n. 1.

"what's this?" the CI replied "$200." The CI claimed to be responding to Vasquez on behalf of another buyer, but that explanation contradicts a post-buy statement by the CI about conducting the buy alone, before the other buyer approached the vehicle. The recording also does not support the CI's story. Further, the CI returned with only nine bags of heroin, rather than the expected ten. The CI paused on the walk back to the surveillance van, rummaged through a bag, and received a phone call from an unknown caller where the CI stated "... I thought that I gave you ... I'm sorry... ."

Also during the fourth buy, when talking to another confidential source, the CI answered affirmatively when asked if the CI was "dope sick," but had "Dilauted [sic] this morning maybe." In a post-buy interview, the CI did not recall seeing a third man in the back seat of the vehicle Vasquez was driving.[3]

## V. The Suppression Hearing

At the Suppression Hearing on September 12, 2013, Lieutenant Sullivan testified regarding his interactions with the CI in this case. He verified that the CI had multiple cooperating individual agreements with the BPD, and that with

---

[3] Vasquez makes additional claims regarding the fourth buy—that after the transaction the CI could not remember what the suspects were wearing and stated that the CI had a bad short-term memory—but the claims are not supported by the Supplemental Investigative Report. Mot. to Suppress, Exh. B, ECF No. 218-2. Vasquez refers the Court to "Post-Buy Interview 4," but does not supply the transcript or recording of any interviews. Mot. to Suppress at 3–4.

regards to the Vasquez investigation the BPD paid the CI $100 for each buy and no other consideration.  He stated that although he knew the CI used drugs, he had been unaware of any drug use during any of the controlled buys.  His testimony about the CI's identification clarified that although he intended to show the CI only the four photos of Vasquez and his associates, he did not intend the CI to see the photo at the time that the CI spotted the photo and declared, "That's him."  Lieutenant Sullivan expressed his belief that because the CI already knew the suspects, then an informal identification of the photos was appropriate.

The CI testified about cooperating against several targets with the BPD.  The CI identified Vasquez from a photograph, but then had difficulty identifying him in the courtroom.  The CI could not see across the courtroom because of near-sightedness and lack of corrective lenses.  As the CI approached the defense table, the U.S. Marshal seated behind Vasquez stood up.  The Marshall wore a suit nearly the same color blue as Vasquez's shirt.  The CI identified the Marshal as Vasquez.  A moment later, the CI stated that the Marshal standing up had been confusing, and that now the CI could see that Vasquez was seated in front of the Marshal.

The CI then testified about a number of interactions the CI had with Vasquez.  Vasquez first approached the CI on the street

in March or April of 2012, asking about the possibility of the CI selling drugs for Vasquez.  Later, the CI, the CI's partner, Vasquez, and Ashley Hammond drove together to St. Albans, where the CI stole clothes for Vasquez and Hammond in exchange for heroin, and the group had dinner together.  The CI then began selling drugs for Vasquez, picking up drugs from him three or four times before becoming a CI in August 2012.

**DISCUSSION**

Vasquez has moved to suppress the evidence obtained pursuant to the September 13, 2012 search warrants on the grounds that the affidavits submitted in support of the warrants misrepresented or omitted material information.  He argues that Lieutenant Sullivan deliberately or recklessly made false statements and material omissions in the affidavits, both of which constitute Fourth Amendment *Franks* violations.  *See Franks v. Delaware*, 438 U.S. 154 (1978).  Vasquez has also requested exclusion of the identification by the CI on the grounds that Lieutenant Sullivan used an unduly suggestive identification procedure.

## I.   The *Franks* Violation

For the Court to hold a *Franks* hearing, Vasquez must meet a two-part burden.  First, he must make a "substantial preliminary showing" that Lieutenant Sullivan "knowingly or intentionally or

with reckless disregard for the truth" included a false
statement or a material omission in his supporting affidavits.
*Franks*, 534 U.S. at 155–56.  Second, Vasquez must show that the
alleged inaccuracy or omission was "necessary for the finding of
probable cause."  *Id.* at 156.  Otherwise, an affidavit enjoys a
"presumption of validity."  *Id.* at 171.

Vasquez listed a number of the affidavits' inaccuracies and
omissions in support of his request.  At the hearing, however,
Vasquez conceded that he incorrectly alleged that the affidavits
failed to disclose that the CI was paid.  Vasquez alleged other
omissions that called into question the CI's credibility:
inconsistencies in the fourth controlled buy that suggested that
the CI stole some of the money or drugs involved in the buy, the
CI's drug use prior to that same purchase and difficulty
remembering what the suspects were wearing after that purchase,
the CI's motivation for past work for the BPD and the
reliability of that work, the CI's opinion of her faulty memory,
and the suggestive nature of the identification of Vasquez by
the CI.  Mot. to Suppress 6–10, ECF No. 218.  In addition,
Vasquez claimed that the affidavits failed to disclose that
Vasquez and Morales are brothers and therefore similar in
appearance.  Mot. to Suppress 10, ECF No. 218.  Vasquez also
claims that the affidavits omitted the poor quality of the
controlled-buy video surveillance and the time periods when the

14

drug transactions took place out of view of the officers.  Mot. to Suppress 10-11, ECF No. 218.

None of the allegations carry weight.  There has been no showing that Lieutenant Sullivan knowingly misrepresented or omitted material exculpatory facts nor acted in reckless disregard for the truth.  Three of Vasquez's claims are untrue. First, the affidavits clearly stated that the CI had provided reliable information to the BPD in the past.  Mot. to Suppress, Exh. 1, ECF No. 218-1 ¶ B4.  The CI's motivation for working as a CI in the past is irrelevant, and Lieutenant Sullivan indicated that monetary compensation motivated the CI in this case.  Mot. to Suppress, Exh. 1, ECF No. 218-1 ¶ B3.  Second, Lieutenant Sullivan explained the nature of the CI's identification of Vasquez, admitting that an accident led to the CI identifying his photo and that he did not believe that a photo array was necessary given the CI's familiarity with the subjects.  Mot. to Suppress, Exh. 1, ECF No. 218-1 ¶ B13. Finally, the affidavits identified the relationship between Vasquez and Morales multiples times, and even explains that they are biological brothers even though they have different last names.  Mot. to Suppress, Exh. 1, ECF No. 218-1 Summary and ¶¶ B19, 20, 26, 32, 33.  The affidavits provided sufficient information to put a judge on notice that Vasquez and Morales may be similar in appearance.

15

Regarding the CI's drug use, Lieutenant Sullivan testified
that although he knew that the CI used drugs, he was unaware of
any use during the controlled buys at the time he wrote the
affidavits.  During the fourth buy, the CI made an unclear
statement about "maybe" taking Dilaudid that morning.  Vasquez
presented no other evidence of Lieutenant Sullivan's knowledge
and intentional omission of the CI's drug use during a buy.  As
for the other alleged omissions, if true, there was no reason
for Lieutenant Sullivan to include the information.  The
affidavits outlined the facts surrounding the CI's involvement
in the case and the outcome of each controlled buy.

Even if the omissions impeach the CI's credibility, the
error does not merit a *Franks* hearing.  Probable cause for the
warrants clearly existed.  Information about Vasquez and his
operation came from multiple sources.  Mot. to Suppress, Exh. 1,
ECF No. 218-1 ¶ B2.  Officers' observations corroborated the
CI's information about Vasquez's use of the Audi and the St.
Paul Street location.  Mot. to Suppress, Exh. 1, ECF No. 218-1
¶¶ B1, 26.  Other sources provided information about the Acura
and the storage unit on Shelburne Road.  Mot. to Suppress, Exh.
1, ECF No. 218-1 ¶¶ B36, 41.  Drug dogs alerted to the existence
of drugs in the Audi.  Mot. to Suppress, Exh. 1, ECF No. 218-1 ¶
B43.  Vasquez himself made statements after his arrest admitting
to his involvement in the drug trade.  Mot. to Suppress, Exh. 1,

16

ECF No. 218-1 ¶¶ B29-31.  Therefore, Vasquez failed to clear the
hurdles necessary to obtain a full *Franks* hearing.  The
affidavits provided ample probable cause to issue the warrants.

## II. The Unduly Suggestive Identification

To constitute a violation of due process, identification
procedures must be "unnecessarily suggestive and conducive to
irreparable mistaken identification." *Richardson v.
Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196, 202
(2d Cir. 2010)(quoting *Foster v. California*, 394 U.S. 440, 442
(1969)).  The Second Circuit has agreed with many other federal
circuit courts that unarranged or accidental pretrial
identifications are permissible and not subject to the
exclusionary rule.  *See id.* at 203-204 (citing cases from other
circuits finding that a voluntary and spontaneous identification
of a suspect upon entering the police station for the purpose of
making an identification was not impermissibly suggestive).

Likewise, the spontaneous identification here was not
unduly suggestive.  The Court credits Lieutenant Sullivan's
affidavit and testimony that he accidentally placed the photo in
view of the CI.  Mot. to Suppress, Exh. 1, ECF No. 218-1 ¶ B13.
Vasquez presented no credible evidence to find otherwise.  Even
if the accidental identification could be considered
unnecessarily suggestive, however, the procedure carried no real
risk of irreparable mistaken identification.  The CI testified

17

at the hearing to her extensive interactions with Vasquez prior
to the date of the identification.  From March or April of 2012
up until the time of the identification in August 2012, the CI
had interacted with Vasquez a number of times.  These
interactions included a day trip to St. Albans with a sit-down
dinner.  The CI also testified to becoming a seller in Vasquez's
drug distribution operation.  Although the CI had difficulty
identifying Vasquez at the hearing, that can be attributed to
near-sightedness and lack of corrective lenses.  The CI viewed a
photo of Vasquez and clearly and confidently identified him.

### CONCLUSION

For the aforementioned reasons, this Court **denies** Vasquez's
motion to suppress evidence and motion to exclude
identification.

Dated at Burlington, in the District of Vermont, this 18th
day of September, 2013.


/s/William K. Sessions III
William K.  Sessions III
U.S.  District Court Judge